## No. 2583.

### Cal. Roy *v.* The State.

1. THEFT—CHARGE OF THE COURT—PURCHASE OF THE ANIMAL was the defense interposed to the prosecution for the theft of the same, and, the defendant having produced evidence tending to establish that defense, he was entitled to an affirmative charge instructing the jury to the effect that if they believed from the evidence that the defendant purchased the animal, or if, from the evidence as to the purchase, they entertained a reasonable doubt that he stole the animal, they must acquit him of the charge of theft. The refusal of a special charge embodying the rule as stated was error.

2. SAME—PRACTICE—NEW TRIAL.—See the statement of the case for the substance of evidence set out in a motion for new trial, which, though not strictly newly discovered, in the light of the evidence on the trial entitled the defendant to a new trial.

APPEAL from the District Court of Travis. Tried below before the Hon. Eugene Williams on exchange.

The conviction in this case was for the theft of a horse, the property of B. F. Cage, and the penalty assessed against the appellant was a term of ten years in the penitentiary.

B. F. Cage was the first witness for the State. He testified, in substance, that some time in the month of April, 1886, he lost his certain mare from her range in Blanco county, Texas. The animal referred to was about fourteen and a half hands high, about four years old, and of a dirty black or blue dun color, such color as is called "grueyer" by the Mexicans. She was unbranded, and was the property of the witness and was in his range possession when taken. Witness had never seen the mare since. He bought her as a colt, and her mother, as estrays, at an estray sale in the town of Blanco. He owned the mother for a short time, and sold her to a Mexican named Gregorio Lopez. The colt (the alleged stolen animal) followed the mother to the range, and remained on the range until she was stolen. The Mexican, Lopez, knew the animal well—better, in fact, than witness did. Witness last saw his animal in March or April, 1886. He ascertained positively that she was missing about the last of June. Late in April a negro told witness that he thought

24

the said mare was in foal, but witness could not tell it from her appearance. Witness did not remember that the animal described had any white about her. She was unbroken, and had never been ridden or worked when she disappeared. When, late in June or early in July, Sheriff Jackson and Gregorio Lopez started to east Texas to look for some of Lopez's missing horses, witness authorized them to sell his said mare, if they should find and recover her. On their return, they reported that they found witness's animal in Shelby county, Texas, and sold her, and Jackson paid witness the money for which he had sold her. Mr. Jackson officiated at the estray sale of the said mare and her mother, and knew both of the animals. Witness, upon reflection, was certain that his said mare had no white about her.

Gregorio Lopez testified, for the State, that about June 15, 1886, he missed nine head of horses from his range in Blanco county and instituted a search for them. He went to the defendant's ranch and asked him if he had seen any of the horses, which the witness described. Defendant looked at the brand on witness's horse and told witness that he need look no further, for that he, defendant, had shipped them to Eastern Texas. B. F. Cage's four year old "grueyer" mare ran with the witness's horses, and had run with them for over two years. Witness knew that animal well from a colt, having owned her mother. That animal disappeared from the range at the same time that witness's animals disappeared. When witness and Sheriff Jackson, a few days later, started to East Texas to look for witness's horses, Mr. Cage authorized Jackson to sell his mare if he should find and recover her. Witness and Jackson went to Centre, in Shelby county, to which point defendant said that he shipped the horses, and at that place witness found five head of his horses, and found the Cage mare in the possession of a man named Stanley. The witness knew that animal to be the Cage mare described in the indictment. She was an unbroken, unbranded mare, four years old, about fourteen hands high, and of a color called indiscriminately "grueyer," blue dun or mouse color. She had no saddle or harness marks on her. She was still wild and unbroken when found in Shelby county. Mr. Jackson sold the mare in Shelby county, and afterward paid the purchase money to Mr. Cage. At the same time and place the witness found a stallion, which was branded with a half circle S, the half circle being under the S, which said stallion the wit-

ness identified as the property of Mr. B. F. Stanley, and which had run on the range in Blanco county, near witness's house. Stanley, the man in Shelby from whom the said horses were recovered, said that he got them from defendant, who was a kinsman of his. The other four horses mentioned by witness as belonging to him the witness had never recovered. When witness first spoke to defendant about the horses, the latter said at once that he had shipped them to East Texas; that he had not fully paid one Bailey for the said horses, and that, if the witness would get an order from Bailey, he would pay the balance due on them to witness. Witness declined to accept the amount offered by defendant, and, besides, had no means of getting the order from Bailey. The Cage mare had no saddle marks on her when found in Eastern Texas.

Sheriff W. I. Jackson testified, for the State, that late in June or early in July, 1886, he went with Gregorio Lopez to Centre, in Shelby county, to look for and recover nine head of Lopez's horses, which were said to have been sent there and sold without authority. They found five head of the Lopez horses, and the four year old, unbroken Cage mare in the possession of one W. Stanley. Witness knew that animal well, and knew her to be the mare of B. F. Cage. People differed about the color of that animal; some called her a mouse color, some a gray, some a dirty gray, some a blue dun and others a "grueyer." However, the witness knew the animal he found in W. Stanley's possession to be Cage's mare, and sold her as Cage's, and afterward paid the purchase money to Cage. Stanley also had in possession the half circle S (B. F. Stanley) stallion, which had run on the range in Blanco county. The Cage mare, when found in Shelby county, was still wild and unbroken, was not bridle wise, and had no saddle or harness marks on her body. The Cage mare had no white feet.

Dan Mackey testified, for the State, that, in June, 1886, he lost seven head of horses from his range in Blanco county, Texas. Witness's brother-in-law, Dave Malone, went to East Texas and recovered the said horses for witness.

Dave Malone testified, for the State, that, in June, 1886, he learned that seven head of Dan Mackey's horses had been shipped from Austin, Travis county, Texas, to east Texas. Acting upon that information, he went to Austin and got Sheriff Hornsby to go with him to Shelby county, where he found the horses in the possession of defendant, who claimed that he

bought them of one T. E. Bailey. Defendant surrendered the horses, and witness sold them in Shelby county.

M. M. Hornsby, sheriff of Travis county, testified, for the State, that, about June 19, 1886, he received a postal card from San Antonio, advertising a certain horse as having been recently stolen. Deputy Sheriff Fred Peck read the postal card, and remarked that he saw the said horse on the day before, at Roy's ranch, in the possession of the defendant. Witness then instructed Peck to go to Roy's ranch and get the horse. Peck left the office, but soon returned and reported that he had met defendant in Austin, and that defendant promised to have the horse in town on the next day. Witness directed Peck to go at once and get the horse. Peck left, and after a time he and Deputy Sheriff W. W. Hornsby returned with the defendant and the horse, and reported that defendant had a drove of twenty-five or thirty head of horses across the Colorado river. The defendant claimed that he bought the horse described in the postal card and the other horses he had in his herd from one T. E. Bailey. Witness told him that, in all probability, all of the horses were stolen, and that, if he wanted to do right about them, he would hold them and permit witness to advertise them. The defendant replied: "Yes, I know they were stolen; but I bought them and have my money in them, and I am going to ship them from here to-night and get my money out of them. I have consulted my lawyer, but, if you want to take the horses away from me, you can do so." The witness declined to take the horses, preferring to take no risks in the matter, as he had no evidence that the horses were stolen. The animal described in the postal was taken from defendant, and the defendant on that night shipped the others. Witness then went to the animal inspector and got a description of all the horses shipped by defendant, and sent the description to the sheriffs of adjoining counties. A few days later, Dave Malone came to Austin and made an affidavit charging the defendant with the theft of seven head of the horses, which he described as belonging to Dan Mackey. Witness telegraphed to Shelby county to secure the arrest of defendant, and then went with Malone to Shelby county, where he found defendant under arrest, and one Stanley in possession of the bunch of horses under a claim of purchase from defendant. The bunch included all of the horses shipped from Austin by defendant, as shown by the list taken by the witness from the inspector's books. The bunch included two or

three more animals than were included in the bills of sale from
Saunders and Bailey to Bohls, exhibited by defendant; each of
these extra animals was unbranded.   Witness saw the alleged
Cage mare in Shelby county.   She was an unbroken and un-
branded dun mare.   He also saw the Lopez horses and the circle
S stallion.   Witness and Malone sold Mackey's horses, arrested
defendant and brought him back to Austin.   The bunch of horses
mentioned by witness were shipped from Austin on or about
June 19, by the defendant and one Bohls.

Fred Peck testified, for the State, substantially as did Sheriff
Hornsby, up to the point when he started from the sheriff's office
to go to Roy's ranch to get the horse.   He then stated that he
met defendant at Long's stable, and asked him where the horse
was.   Defendant said that he was at home, lame, and asked why
witness inquired.   Witness replied that he had a postal card
describing him as a stolen horse, and was instructed by Sheriff
Hornsby to go to the ranch and get him.   Defendant replied that
he had left the horse at his ranch to be forwarded the next day,
and promised witness to produce him on the said next day.   Wit-
ness and Will Hornsby then went back and reported to the sheriff,
who ordered them to go after the horse without delay.   On their
way out of town they met defendant and told him that Sheriff
Hornsby declined to wait, and had directed them to go and get
the horse.   Defendant then admitted that he had lied about the
horse, and said that it was then across the river from Austin in
a bunch he intended to ship on that night.   Witness went across
the river and got the horse from a bunch of twenty-five or thirty
under herd, and in possession of defendant and one Bohls.   Wit-
ness heard defendant tell Sheriff Hornsby that he, defendant,
knew all of the horses were stolen, but that he had his money
in them and intended to get it out.

Will Hornsby, testifying for the State, corroborated the witness
Peck.

William Chapman testified, for the defense, that he lived at
Dripping Springs in June, 1886.   Late in May or early in June,
1886, a man named T. E. Bailey, whom witness had previously
met, came to witness's house and asked the way to Roy's house.
He said that he had horses to sell.   He passed the night with
witness, and on the next morning witness went with him to
Roy's, and heard Roy agree to buy from twelve to fifteen horses
from him, the horses not being present.   A few days later Bailey
returned to Roy's while witness was there, bringing twelve or

fifteen horses, which he sold to Roy. Witness drew up the bill of sale—the instrument now shown him. Bailey then took the bill of sale, saying that he would take it to Mr. Morris, the justice of the peace at Cypress Mill, to acknowledge it. Witness left Bailey at the mills and went on to Llano county, to get a horse for Roy. The bill of sale included an animal in the half circle S brand, which was Stanley's brand. It was executed to Gus Bohls, Roy's partner, because Bohls was to take the horses to east Texas for sale.

L. F. Tucker testified that he lived at Dripping Springs in June, 1886, and then knew the defendant and one Bailey. He met Bailey at defendant's house during that month, when Bailey was trying to sell some horses to Roy. Roy, Bailey and witness afterwards went to a pasture in which Bailey pointed several horses out to Roy, as the ones he wanted to sell him. Witness could not now describe the said horses. The witness was familiar with the title to one animal only of those shipped by Roy to Eastern Texas. That was a brown mare sold by the witness to Roy. She was about thirteen hands high, and was unbranded; had a white star in the forehead, and her left hind foot was white, and her back was saddle marked. Roy gave witness a horse for the mare. Witness bought the mare described from Jim Cox, in May, 1886. The animal was saddle-broken and was quite gentle.

J. E. Morris, justice of the peace, testified, for the defense, that he knew T. E. Bailey. Said Bailey acknowledged, before witness, the bill of sale in evidence, in which he conveyed certain horses to Gus Bohls. Witness wrote the certificate of acknowledgment. Witness's record showed that the half circle S brand was in the said bill of sale when it was acknowledged. Witness never saw any of the horses described in the bill of sale. The defense then put in evidence a bill of sale, executed by T. E. Bailey, and witnessed by William Chapman and Aubry Clayton, purporting to convey fifteen head of horses in various brands and descriptions. It does not describe a "dirty gray, mouse-colored or dun mare, unbranded, and four years old." It described, however, an unbranded brown mare.

Mrs. Roy, the defendant's wife, testified in his behalf, that in May, 1876, L. T. Tucker or his brother, put a certain unbranded brown mare in defendant's pasture. That animal had one white foot. She remained in the pasture until the herd of horses were taken to Austin in June, for shipment, and was taken with the

herd, and the witness supposed was shipped with them. Witness was present when Bailey brought twelve or fifteen head of horses to defendant's place, and she saw the bill of sale from Bailey to Bohls when the same was executed.

Gus Bohls testified, for the defense, that in June and July, 1886, he and defendant were partners in some horse transactions. In June of that year witness and appellant bought some horses from one Thomas or Tom Bailey. Witness was present when the bill of sale, written by Chapman, was executed by said Bailey. The bill of sale was executed in the name of the witness as the purchaser, because it was arranged at that time that the witness was to take them to the East Texas market. The price agreed upon was two hundred and forty dollars for fifteen horses, of which the witness paid Bailey forty dollars in cash, and he and defendant executed their note to Bailey for the balance of two hundred dollars. The said horses were placed in the herd which was driven to pasture near Austin, and held there for inspection. The herd was not stopped on the regular public road, but a short distance from it, in an old field, over which travelers passed when the river was up and the roads bad. They were not stopped there for the sake of secrecy, but because they could be easily held in that field by one man. Witness afterwards took the horses to Shelby county and sold them to Mr. W. Stanley. The horses were afterwards taken by officers from Shelby and Blanco counties, and by parties who claimed them. Among the horses so sold to Shelby by the witness and defendant was a little brown mare, which the witness understood was claimed to be the Cage animal. There was but one other unbranded mare in the bunch, and she was claimed and taken by Dave Malone as the mare of Dan Mackey. The animal claimed as the Cage animal was unbroken and was sold by witness to Stanley as an unbroken animal. In the prosecution of their partnership business, the defendant did the buying, but took the bills of sale in the name of the witness, who was to take the animals to market. Witness paid his own forty dollars on the Bailey purchase, and joined in the two hundred dollar note executed by defendant for the balance of the purchase money. The witness did not know, nor did he suspect, that any of the horses were stolen, nor was he present when defendant received them from Bailey. When the horses were collected, Roy drove them to witness's place in Travis county, and witness and Roy

drove them together to Austin, and thence shipped them to Shelby county on June 19, 1886.

George Coffee testified, for the defense, that he knew the Cage mare which it is charged in the indictment was stolen by defendant, and at one time owned the mother of that animal. He last saw that mare on the range in April, 1886. He then thought, and was still of the opinion, that the said Cage mare was in foal. Witness was a horse expert, and could tell the difference between a foal-heavy and a grass-fat mare.

The motion for new trial (supported by affidavits of B. F. Cage, W. Stanley, Mrs. Roy and L. T. Tucker) alleges that since the trial and conviction of the defendant, he, the defendant, had sent to Shelby county for the animal sold by Sheriff Jackson as the Cage mare, and had her brought to Austin for the inspection of the several witnesses who testified on the trial. Stanley's affidavit alleges that the said animal was the only unbranded mare bought by the witness from W. I. Jackson, sheriff of Blanco county, Texas; that said animal was one of a number of horses purchased by affiant from said Jackson on the tenth day of July, 1886; that the said animal was a "brown two year old mare, star or white spot in the forehead, and left hind foot white," and was so described in the bill of sale executed by said Jackson to said affiant, which said bill of sale was attached to this affidavit as an exhibit. The affiant alleged that, upon the arrival of the said mare in Austin he pointed her out to B. F. Cage as the animal which Sheriff Jackson seized in Shelby county as the property of said Cage, and which he sold to the affiant as the said Cage's; that the animal so seized in Shelby county and sold to witness as the Cage mare, and the animal which affiant pointed out to said B. F. Cage, was one and the same animal. To this affidavit was attached the original bill of sale executed by W. I. Jackson to W. Stanley, which said bill of sale purported to convey to said Stanley five certain mares and horses described by color and brands, and "one brown two year old mare, star or white spot in forehead, and left hind foot white."

The affidavit of Ben. F. Cage identified the signature of W. I. Jackson to the bill of sale attached to Stanley's affidavit as genuine, and affirmed that said Cage had examined the mare claimed by Stanley to be the only unbranded animal bought by him from W. I. Jackson on July 10, and as the animal which was taken from him, the said Stanley, by said Jackson, as the property of

said Cage and resold to him by the said Jackson, as the property of the said Cage; and the affiant declared that the said animal so pointed out to him by the said W. Stanley was not, and never had been, his property, and was not the animal which disappeared from the affiant's range possession in the spring of 1886.

The affidavit of Mrs. S. A. Roy affirmed that she had examined the animal brought back from Shelby county, and that it was the identical animal sold to the defendant by L. T. Tucker, and which was shipped by the defendant and Gus Bohls to eastern Texas, as testified by the affiant on the trial of this case. L. T. Tucker's affidavit was to the same effect.

*Walton, Hill & Walton* and *Sheeks & Sheeks*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE. Counsel for defendant requested a special instruction, as follows: "If the jury believe, from the evidence, that the defendant purchased or traded for the animal alleged to have been stolen, giving value therefor, in good faith, then you will find defendant not guilty." There was evidence tending to show that the defendant had purchased said animal, and the defendant was enitled to a direct, affirmative charge upon that issue. In the charge given by the court to the jury there is no such direct affirmative charge, but the issue is presented to the jury in a negative form, and in a connection which might have misled the jury. We think the above special instruction, or a similar affirmative one, instructing the jury that, if they believed, from the evidence, that the defendant purchased the animal, or if, from the evidence as to the purchase, they entertained a reasonable doubt that the defendant stole the animal, they must acquit him of the charge of theft. (Murphy v. The State, 17 Texas Ct. App., 645.) We are of the opinion that the failure of the court to give a proper charge upon the issue of purchase was material error, for which the conviction should be set aside.

We are also of opinion that the court erred in not granting the defendant a new trial. While the additional evidence disclosed by the affidavits accompanying said motion may not, in strictness, be regarded as newly discovered, still, we think fairness and justice required that a new trial should have been awarded. The judgment is reversed and the cause is remanded.

*Reversed and remanded.*